UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>POSITION GURUS, LLC, a Washington limited liability corporation; TOP SHELF ECOMMERCE, LLC, a Washington limited liability corporation; AARON POYSKY, individually and as an owner of POSITION GURUS, LLC, and TOP SHELF ECOMMERCE, LLC; STACY GRIEGO, individually and as an owner of POSITION GURUS, LLC, and TOP SHELF ECOMMERCE, LLC; and SAMUEL COHEN BROWN, individually and as an owner of POSITION GURUS, LLC, and TOP SHELF ECOMMERCE, LLC,<br><br>Defendants. | Case No. 2:20-cv-710<br><br>COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101– 6108, and the Consumer

COMPLAINT - 1

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, to obtain injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and the CRFA, 15 U.S.C. § 45b.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c), and (d), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

4. Since 2015, Defendants have run a deceptive telemarketing operation selling Internet marketing products and services to consumers trying to start a home-based Internet business. Defendants induce consumers to pay thousands of dollars by falsely promising, among other things, that their products and services will enable consumers' home-based Internet businesses to succeed and be profitable. Contrary to Defendants' representations, many consumers who purchase Defendants' products and services do not end up with a functional website, earn little or no money, and end up heavily in debt.

5. Through this scheme, Defendants have violated the FTC Act, the Telemarketing Sales Rule, and the CRFA by, among other things: (1) making unsubstantiated and false earnings and product claims; (2) making false claims about their business affiliations and need for consumers' personal financial information; and (3) using form contract provisions that restrict individual consumers' ability to review or complain about Defendants' products, services, or conduct. The FTC seeks equitable relief to put a stop to this scheme and hold Defendants liable for millions of dollars of consumer harm they have caused.

## PLAINTIFF

6. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive or abusive

COMPLAINT - 2

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

telemarketing acts or practices. Additionally, the FTC enforces the CRFA, 15 U.S.C. § 45b, which prohibits the offering of provisions in form contracts that restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's products, services, or conduct.

7. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, the TSR, and the CRFA to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 45b(d)(2)(A), 53(b), 56(a)(2)(A)–(B), 57b, and 6102(c).

## DEFENDANTS

8. Defendant POSITION GURUS, LLC ("Position Gurus"), is a Washington limited liability corporation with its principal place of business at 833 Industry Drive, Tukwila, Washington 98188. Defendant Position Gurus transacts or has transacted business in this District and throughout the United States. Since at least 2015, acting alone or in concert with others, Defendant Position Gurus has advertised, marketed, distributed, or sold Internet business marketing products and services to consumers throughout the United States.

9. Defendant TOP SHELF ECOMMERCE, LLC ("Top Shelf"), was a Washington limited liability corporation with its principal place of business at 833 Industry Drive, Tukwila, Washington 98188, that was dissolved administratively on September 3, 2018. Defendant Top Shelf transacts or has transacted business in this district and throughout the United States. Since at least 2015 until approximately March 2017, Defendant Top Shelf, acting alone or in concert with others, has advertised, marketed, distributed, or sold Internet marketing business products and services to consumers throughout the United States.

10. Defendant AARON POYSKY, was an owner of Defendant Top Shelf and is an owner and manager of Defendant Position Gurus. Defendant Aaron Poysky was responsible for the management and daily operations of Top Shelf and is responsible for management of the daily operations of Position Gurus. He is a signatory for Defendants Position Gurus' and Top Shelf's merchant and bank accounts. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Aaron Poysky resides in this

COMPLAINT - 3

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.     Defendant STACY GRIEGO was an owner of Top Shelf and is a de facto owner and manager of Defendant Position Gurus.  Defendant Stacy Griego manages the telemarketing sales room of Defendant Position Gurus and manages daily activities for the company.  He performed the same activities for Defendant Top Shelf.  He is also a signatory on merchant and bank accounts used by Defendant Top Shelf.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Defendant Stacy Griego resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

12.     Defendant SAMUEL COHEN BROWN was an owner of Defendant Top Shelf and was a de facto owner and manager of Defendant Position Gurus.  Defendant Samuel Cohen Brown managed the daily operations of the companies, including, but not limited to, managing product and service fulfillment.  He also was a signatory on merchant and bank accounts used by Defendant Top Shelf.  Since at least 2015 and until approximately March 2017, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Defendant Samuel Cohen Brown resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

13.     Defendants Position Gurus and Top Shelf (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the unlawful acts and practices alleged below.  Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations, and that sell the same products or services, use identical contracts, maintain a shared customer database, and commingle funds. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Defendants Aaron Poysky, Stacy Griego, and Samuel Cohen Brown (collectively, "Individual Defendants") have formulated, directed, controlled, had

COMPLAINT - 4

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

the authority to control, or participated in the acts and practices of Corporate Defendants that constitute the common enterprise.

## COMMERCE

14. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

15. Since at least 2015 to approximately March 2017, Defendant Top Shelf sold marketing-related products and services to consumers trying to start a home-based Internet business. In or around March 2017, Defendant Top Shelf ceased sales to new customers.

16. Since at least 2015 and continuing thereafter, Defendant Position Gurus sold primarily the same marketing-related products and services as Defendant Top Shelf to consumers trying to start a home-based Internet business. After Defendant Top Shelf ceased making new sales in 2017, Defendant Position Gurus continued making new sales and provided products and services to Defendant Top Shelf's existing customers.

17. Defendants are or have engaged in telemarketing through a plan, program, or campaign involving one or more telephones and more than one interstate call. They are using or have used a variety of deceptive tactics described herein to induce consumers to purchase products and services purportedly designed to help them build and market a home-based business on the Internet.

18. Typically, Defendants sell consumers marketing products and services that they claim will substantially increase the visibility of and drive customer traffic to consumers' ecommerce websites on the Internet. These products and services include, but are not limited to, website building, directory submissions, Quick Response codes, social media page design, video development, video social submissions, infographics, press releases, and article marketing. Defendants typically charge consumers an upfront fee of several thousand dollars for their various products and services.

19. Defendants rely on consumer leads to market their products and services to consumers. Those potential customers often have already purchased a purported business opportunity, or a related product or service, from another telemarketing operation that, in turn, sold its customers' information as leads to Defendants. The FTC has sued some of these other telemarketing

COMPLAINT - 5

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

operations for similarly deceptive telemarketing practices. *See FTC v. Lift International, LLC*, Case No. 2:17-cv-00506-RJS (D. Utah filed June 5, 2017), and *FTC v. Vision Solution Marketing, LLC*, Case No. 2:18-cv-00356-CW (D. Utah filed May 1, 2018).

20. Defendants also obtain leads by using a service that searches for, extracts, and copies data from newly registered websites. This process, called "web scraping," enables Defendants to produce leads of consumers who have recently registered websites. Many of these websites are registered to consumers who are trying to develop a new online business on Internet platforms such as Shopify and Volusian.

21. Defendants' telemarketing staff contact consumers identified as leads by telephone to sell Defendants' products and services. In many instances, after completing an initial sale, Defendants' telemarketing sales staff continue to contact the same consumers again to "upsell" additional products and services that they claim consumers need for their websites to succeed and be profitable.

22. The sales calls typically last for more than an hour over the course of one or more telemarketing calls. Defendants' telemarketing staff use high-pressure sales tactics and a number of misrepresentations, as outlined below, to generate sales.

23. Consumers who agree to purchase Defendants' products and services are provided with an electronic "service agreement" at the end of the call and asked to provide an electronic signature. The service agreements are virtually the same for Top Shelf and Position Gurus.

24. In numerous instances, when discussing the service agreements, Defendants' telemarketers only emphasize the products and services itemized for purchase. They do not highlight or bring consumers' attention to the disclaimers that contradict or qualify what consumers are told over the phone.

25. Defendants typically remit a portion of the revenue generated from each lead that they obtain from other telemarketing operations. This portion is typically 25-40% of the revenue generated, which Defendants give back to the lead source as payment for the lead. Defendants also sell leads that they generated to other telemarking operations and earn typically 25-40% of the sales that other telemarketing operations make on their leads.

26. Defendants' telemarketing staff typically are paid state minimum wage or approximately 15% of the revenue they generate from sales, whichever is greater.

COMPLAINT - 6

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

**Misrepresentations About Affiliation**

27. When Defendants' lead data is purchased from another telemarketing operation, in numerous instances, Defendants' telemarketing staff begin their sales calls by misrepresenting to consumers that they are affiliated with the other telemarketing operation with whom the consumer already has a relationship.

28. In numerous instances, they state that they are calling from "the online development office for [the lead source]," and that they are calling because they are the consumers' "start up specialist" and would "like to cover the next steps." In numerous instances, they specifically identify and refer to consumers' newly registered websites by URL name, strongly implying that the caller is familiar with consumers' previous efforts to develop a new online business.

29. In numerous instances, passwords are included in the lead data that Defendants purchase from other telemarketing operations. These passwords are associated with specific consumers who were instructed to speak only to those callers offering business development products and services who can provide the password. Defendants use the passwords associated with the leads when they call consumers to persuade them to speak with them.

30. As a result, Defendants' telemarketing staff mislead consumers to believe that the Defendants are connected to or affiliated with the companies that sold the products or services that the consumers already purchased.

31. Defendants' telemarketers further compound consumers' confusion by failing to promptly disclose that the purpose of the call is to sell an additional product or service. Defendants' telemarketers therefore mislead consumers to believe that Defendants are calling to fulfill or otherwise provide a service already purchased.

**Misrepresentations to Obtain Consumers' Personal Financial Information**

32. Defendants charge consumers as much as several thousand dollars for each of their various products and services. Defendants do not provide their telemarketing sales staff with a price list for their products and services. Instead, the exact price typically depends on the amount of savings and credit consumers have available.

33. In numerous instances, Defendants' telemarketers probe consumers' financial circumstances and financial account information during sales calls in order to determine the prices they can charge and thereby maximize sales. They ask consumers for their credit card numbers, issuing bank names, credit limits, and current balances, claiming that they will use this

COMPLAINT - 7

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

information to determine whether consumers "qualify" to work with Defendants. Defendants' telemarketers misrepresent that thousands of people purchase their program each week.

34. In numerous instances, Defendants' telemarketers tell consumers that they need consumers' personal financial information to help them determine whether they can meet their financial goals, stating that Defendants' "primary goal is to help you create an additional source of income . . . in order to make sure we set you up with the right business plan and decide how much you need to make."

35. In numerous instances, Defendants' telemarketers then call the issuing banks for consumers' credit cards to verify consumers' available credit. In some instances, Defendants' telemarketers direct and help consumers to open new lines of credit or increase their credit limits with issuing banks.

36. Defendants' telemarketers' representations about how they are using consumers' financial information are false because their telemarketers do not use the information for these purposes. Instead, in numerous instances, Defendants' telemarketers use this information to decide how much to charge consumers for products and services, and how many products and services to sell them. The more credit consumers have on hand, the more Defendants' telemarketers ask them to pay.

## Misrepresentations About Costs and Earnings

37. In numerous instances, Defendants' telemarketers persuade consumers to purchase their products and services by claiming that consumers ultimately will not have to pay for the charges out of their own pocket. They encourage consumers to use their personal credit cards to pay for the program as part of a so-called "OPM" strategy, specifically, using Other People's Money (e.g., the bank's money). Defendants' telemarketers claim that consumers who purchase Defendants' products and services will earn enough money from their future businesses to recoup the purchase price.

38. Defendants' claim about recouping the purchase price is false because, in numerous instances, consumers who purchase Defendants' products and services are not able to recoup the purchase cost from future business income. In fact, in numerous instances, consumers who purchase Defendants' products and services are never able to establish an operating business.

39. In numerous instances, Defendants' telemarketers ask consumers about their financial goals and how much they want to earn from the future business. In numerous instances,

COMPLAINT - 8

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

Defendants' telemarketers tell consumers that their stated financial goals of several thousand dollars a month are obtainable using Defendants' products and services.

40. Many of the consumers who purchased Defendants' products and services did not earn substantial income of thousands of dollars a month from future businesses. In fact, in most instances, consumers who purchased Defendants' products and services were never able to establish an operating business.

### Misrepresentations About the Scope and Nature of Products and Services Provided

41. In numerous instances, Defendants' telemarketers tell consumers that Defendants' products and services will drive substantially more purchasers to consumers' ecommerce websites.

42. In numerous instances, Defendant's products and services do not drive substantially more purchasers to consumers' ecommerce websites. In fact, many consumers who purchase Defendants' products and services do not end up with a functional website.

### Top Shelf and Position Gurus Incur Excessive Chargebacks

43. Consumers have the ability to dispute charges that appear on their credit card bills by initiating what is known as a "chargeback" with their issuing bank. The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills.

44. Credit card associations such as VISA and MasterCard have rules regarding the chargeback process. The rules provide that when a consumer disputes a charge through the chargeback process, the consumer's issuing bank provisionally credits the consumer's credit card for the amount of the disputed charge. The consumer's dispute is then relayed to the merchant, which in turn, may challenge the attempted chargeback by arguing the charge was, in fact, valid. If the merchant challenged the attempted chargeback, the credit card association rules govern the manner in which the dispute is resolved.

45. Defendants vigorously defend against chargebacks from dissatisfied customers. Defendants dispute chargebacks by relying on a 3-day cancellation provision in their service agreements. However, Defendants typically schedule several appointments with consumers during those first three days, teaching them how to use social media sites such as Facebook, Twitter, and Pinterest, and thereby keeping them occupied and preventing cancellations.

46. Defendants also vigorously dispute chargebacks by providing copies of consumers' service agreements and screen shots of work that Defendants purport to have completed for

COMPLAINT - 9

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

those consumers.  In numerous instances, Defendants' customers who sought chargebacks have stated that they did not know if Defendants actually provided the purported products and services or, if the Defendants did, the customers did not know how to use the products and services because they were not adequately shown how to use them.

47. Despite Defendants' efforts to challenge these chargeback requests, Corporate Defendants still incurred excessive chargeback rates indicative of deceptive practices.  For example, in 2017, Defendant Top Shelf had a chargeback rate of approximately 38% and Defendant Position Gurus had a chargeback rate of approximately 11.9%.  A chargeback rate of greater than 1% is generally considered excessive by the credit card associations.

48. Defendants Stacy Griego and Samuel Cohen Brown opened merchant accounts for Top Shelf, and each of the Individual Defendants had access to or were informed about consumers' individual chargeback requests to, and the chargeback rates of, the Corporate Defendants.

49. In numerous instances, Defendants only provide refunds or partial refunds to consumers who complain to law enforcement authorities or the Better Business Bureau.  In numerous instances, when Defendants provide refunds or partial refunds, they first require those consumers to retract or withdraw their complaints to law enforcement authorities or the Better Business Bureau.

## **Prohibited Contract Provision**

50. Since 2015 and continuing until approximately February 2019, Defendants used, in their form contracts offered to thousands of consumers in the course of selling their goods and services nationwide, the following provision:

> **Prohibited Practices & Non-Disparagement**
> 
> a. Client shall not . . . refer, or encourage others to refer, to Position Guru's [sic]/Top Shelf, its customers, owners, officers, directors, personnel, agents, representatives or affiliates on any manner that is illegal, fraudulent, threatening, abusive, defamatory, or obscene, or that could cause damage or adversely affect its customers, reputation, business, and property, services, or products in any manner.
> 
> b. Client shall not make or encourage others to make any statement or release any information that is intended to, or reasonably could be foreseen to, embarrass, criticize, damage, or adversely affect Position

COMPLAINT - 10

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

    Guru's [sic]/Top Shelf, its customers, owners, officers, directors, personnel, agents, representatives, or affiliates.  A statement or release of any information under this section includes, but is not limited to, posting an internet websites, bulletin boards, blogs, or discussion groups, and submission to any publication.

  c. Due to the difficulty of ascertaining the pecuniary amount of damages caused by any violation of this section, the parties agree that for each violation of this section, the violating party shall pay the damaged party liquidated damages in an amount not less than ten (10) times the annual fee for all Services to which this Agreement applies. Client agrees that this liquidated damages provision is a reasonable estimate of the damage caused to Position Guru's [sic]/Top Shelf due to a violation of this section.

Copies of Defendants' "Service Agreement" that include this paragraph are attached hereto as **Exhibit A** at pages A-6 and A-15.  Defendants' form contracts were in effect on or after December 14, 2017.

### Defendants' Continuing Law Violations

51. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things, Defendants engaged in their unlawful acts and practices knowingly, repeatedly over a period of four and a half years, and despite knowledge of numerous complaints.  Further, Defendants remain in the telemarketing business and maintain the means, ability, and incentive to continue or resume their unlawful conduct.

### VIOLATIONS OF THE FTC ACT

52. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

53. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

54. As set forth below, Defendants have engaged in violations of Section 5(a) of the FTC Act in connection with the telemarketing and sale of their marketing-related products and services to consumers trying to start a home-based Internet business.

## COUNT I

**(Misrepresentation of Earnings)**

55. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' products and services, Defendants represent, directly or indirectly, expressly or by implication, that consumers who purchase Defendants' products and services:

   a. will recoup the cost of Defendants' products and services through business earnings; and/or

   b. will likely earn substantial income, such as several thousand dollars monthly.

56. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 55, consumers who purchase Defendants' products and services:

   a. do not recoup the cost of Defendants' products and services through business earnings; and/or

   b. do not earn substantial income, such as several thousand dollars monthly.

57. Defendants' representations set forth in Paragraph 55 are false or misleading or are not substantiated at the time the representations are made.

58. Therefore, Defendants' representations as set forth in Paragraph 55 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

**(Misrepresentation Regarding Products and Services Provided)**

59. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' products and services, Defendants represent, directly or indirectly, expressly or by implication, that Defendants' products and services will drive substantially more purchasers to consumers' ecommerce websites.

60. In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 59, Defendants' products and services do not drive substantially more purchasers to consumers' ecommerce websites.

61. Defendants' representation set forth in Paragraph 59 is false or misleading or is not substantiated at the time the representation is made.

COMPLAINT - 12

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

62. Therefore, Defendants' representation as set forth in Paragraph 59 is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

**(Misrepresentation of Defendants' Need for Consumers' Financial Information)**

63. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' products and services, Defendants represent, directly or indirectly, expressly or by implication, that Defendants need to obtain consumers' financial information to determine whether consumers are qualified to use Defendants' products or services or whether consumers will be able to reach their financial goals.

64. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 63, Defendants do not use consumers' financial information to determine whether consumers are qualified to use Defendants' products or services or whether consumers will be able to reach their financial goals.

65. Therefore, Defendants' representations as set forth in Paragraph 63 are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

66. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108, in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

67. Defendants are "seller[s]" and "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

68. The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

69. The TSR requires telemarketers to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call: (1) the identity of the seller; (2) that the purpose of the call is to sell goods and services; and (3) the nature of the goods and services. 16 C.F.R. § 310.4(d)(1), (2), and (3).

COMPLAINT - 13

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

70. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes and unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### (Misrepresentation of Performance, Efficacy, Nature, Characteristics of Goods and Services Sold)

71. In numerous instances in connection with the telemarketing offers to sell Defendants' product and services, Defendants, directly or indirectly, expressly or by implication, make misrepresentations regarding the material aspects of the performance, efficacy, nature, or essential characteristics of their products and services, such as:

    a. consumers who purchase Defendants' products and services will recoup the cost through business earnings;
    b. consumers who purchase Defendants' products and services are likely to earn substantial income, such as several thousand dollars monthly; and
    c. Defendants' products and services will drive substantially more purchasers to consumers' ecommerce websites.

72. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 71:

    a. consumers who purchase Defendants' products or services do not recoup the purchase costs through business earnings;
    b. consumers who purchase Defendants' products and services do not earn substantial income, such as several thousand dollars monthly; and
    c. Defendants' products and services do not drive substantially more purchasers to consumers' ecommerce websites.

73. Therefore, Defendants' acts and practices, as described in Paragraph 71, violate Section 310.3(a)(2)(iii) of the TSR, 16 C.F.R. § 310.3(a)(2)(iii).

COMPLAINT - 14

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

# COUNT V

## (Failure to Disclose the Identity, Purpose of the Call, And Nature of Products and Services Sold)

74. In numerous instances in connection with the telemarketing offers to sell Defendants' products and services, Defendants, directly or indirectly, fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call:

   a. the identity of the seller;
   b. that the purpose of the call is to sell goods or services; and
   c. the nature of the goods or services.

75. Defendants' acts or practices, as described in Paragraph 74, violate Section 310.4(d)(1), (2), and (3) of the TSR, 16 C.F.R. § 310.4(d)(1), (2), and (3).

## VIOLATION OF THE CONSUMER REVIEW FAIRNESS ACT OF 2016

76. The Consumer Review Fairness Act of 2016 ("CRFA"), Pub. L. No. 114–258, 15 U.S.C. § 45b, was enacted on December 14, 2016. As of March 14, 2017, Section 2(b) of the CRFA renders void, and Section 2(c) of the CRFA prohibits the offering of, provisions in form contracts that restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's products, services, or conduct; or that impose a penalty or fee against individual consumers who engage in such communications. 15 U.S.C. § 45b(a)(2), 45b(b)(1), and 45b(c).

77. Plaintiff FTC is authorized to enforce Section 2(c) of the CRFA in the same manner, and by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the FTC Act, 15 U.S.C. §§ 41–58, were incorporated into and made a part of the CRFA. 15 U.S.C. § 45b(d)(2)(A). The FTC's enforcement authority under the CRFA applies to contracts in effect on or after December 14, 2017. 15 U.S.C. § 45b(i)(2).

78. Pursuant to 15 U.S.C. § 45b(d)(1), a violation of 15 U.S.C. § 45b(c) shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B).

COMPLAINT - 15

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

## COUNT VI

### (CRFA Violation)

79. As described in Paragraph 50, Defendants have offered, in the course of selling their goods or services, form contracts, as that term is defined in 15 U.S.C. § 45b(a)(3), that contain a provision made void by 14 U.S.C. § 45b(b)(1).

80. Therefore, the acts and practices set forth in Paragraph 50 occurring on or after March 14, 2017 violate Section 2(c) of the CRFA, 15 U.S.C. § 45b(c).

## CONSUMER INJURY

81. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Telemarketing Act, the TSR, and the CRFA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

82. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

83. Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and Section 2(d) of the CRFA, 15 U.S.C. § 45b(d) authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, TSR and the CRFA, including the rescission or reformation of contracts and the refund of money.

## PRAYER FOR RELIEF

84. Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 2(d) of the CRFA, 15 U.S.C. § 45b(d), and the Court's own equitable powers, requests that the Court:

    A. Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the CRFA by Defendants;

COMPLAINT - 16

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)

B. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the CRFA, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C. Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

CHARLES A. HARWOOD
Regional Director

s/Nadine S. Samter
NADINE S. SAMTER, WSBA # 23881
SOPHIA CALDERÓN, Cal. Bar. # 278135

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION
915 Second Avenue, Ste. 2896
Seattle, WA  98174
nsamter@ftc.gov/(206) 220-4479/cell (202) 725-4585 (Samter)
scalderon@ftc.gov/(206) 220-4486 (Calderón)

Facsimile:  (206) 220-6366

COMPLAINT - 17

Federal Trade Commission
915 Second Ave., Ste. 2896, Seattle, WA 98174
(206) 220-4479 (Samter)/(206) 220-4486 (Calderón)